Mr. Chilton, good morning. You may proceed. Good morning, judges. May it please the Court, I'm Gary Chilton. I represent Continental Resources. This case presents an important legal issue, and that's the reason we appealed it. Does Continental Resources have the absolute right to exclude Jerry Janvrin from its property? The trial court said no, not if it would improperly interfere with Jerry Janvrin's business interests. By doing so, the trial court elevated Jerry Janvrin's business interests over Continental's absolute right as all citizens to control who comes onto its property. But I wonder . . . I found it a little difficult to discern exactly what the plaintiff's case was, but the best case, it seems to me, is a claim that your client did more than that, that your client induced CTAP to quit doing business altogether with Jerry Janvrin. Is that the theory of the case? That might be the theory, but that was not the evidence, and it's not . . . It might be, but you were saying that . . . I mean, what you said is unexceptional. Of course, a person can exclude a person from his property, but that's apparently not the theory of this case, although, as I've said, I'm having some difficulty discerning exactly what it is on the record. Well, I was going to state to the Court in my argument that there was one thing that the parties agreed upon, and that is that Continental's request was limited to having Jerry Janvrin come to its well locations, and I can base that on their brief here. It states on page 12 of their response brief, it is clear that the request, as testified to by McCarl, and he's with CTAP, was to prevent Jerry Janvrin from delivering to any Continental locations in the Bowman region. Now, the factual dispute at trial was the Continental officers testified, we didn't want him coming to our well locations in the Buffalo District. That's a small, little district in the northwestern corner of South Dakota. Mr. McCarl, who's the CTAP representative at trial, got on the witness stand, and he said, well, I thought they said to any Continental well locations anywhere in the Bowman, North Dakota area. And that's what the plaintiff is stating in their brief. It is clear that the request was to prevent Janvrin from delivering to any Continental locations in the Bowman region. And as to their theory for the case, then on page 5, they say, therefore, Anderson's request, as testified to by McCarl, would inevitably have the result of putting Janvrin out of business. So the whole theory here is that while the plaintiff recognizes and the court recognized that we do have a right to exclude others from our property, they both qualified it, and this is where we think the trial court made an error. They said, you can't exclude them, you do not have an absolute right to exclude them from your property, if it will improperly interfere with their business. But that's not the law in any reported case that we can find. Putting him out of business, does that mean that almost all of Janvrin's work had to do with Continental, or that CTAP discontinued its use of Janvrin anywhere? Mr. Janvrin focused his trucking company out of the Bowman, North Dakota area. That was his choice. CTAP has several terminals. The Bowman area principally, well, it served a lot of wells throughout the Bakken. But Continental's request was, but the Bowman area services the Buffalo District. I understand that. But my question is, is the complaint that he was put out of business because Continental was about the only place he ever delivered to? I believe that the testimony was that Continental was CTAP's largest customer, and by Continental not wanting him to come to their well locations effectively put him out of business. So it was not that CTAP refused to deal with him with respect to any shipments as a result of this conversation? Just not Continental, but anybody. They would not use him to haul to any place. That's not the case? The testimony was that CTAP was not going to use him to deliver out of the Bowman, North Dakota yard. To anybody? To anybody. That's not what Continental asked them. The testimony was that CTAP made that decision. Mr. McCarl testified under oath. It was my decision. I own up to it. He didn't want his people on the ground in the Bowman yard to get confused and accidentally send Jerry Janburn to one of Continental's well locations. So what CTAP did is they pulled him out of the lineup. Completely? Completely out of the Bowman, North Dakota yard. Did he do business in any other yard? Yeah, there was testimony that he made deliveries from other yards. Other yards. But apparently us, Continental, requesting CTAP not to send him to Continental well locations, wherever they might be, effectively put him out of business. So that goes back to what's the principal issue here. There was, in the district court, one of the district court's orders, there was a suggestion that a jury might believe that in this conversation between, I believe it was Anderson and McCarroll, there was a kind of an implicit wink or nod or something to the effect that, well, I want you simply to discontinue any deliveries by him out of the Bowman yard. Not just to us, but anybody. Well, we don't know what facts the jury found because they were instructed they could rule against Continental merely if there was what they perceived to be improper interference. So, for example, the jury could have found that Continental's request not to have Janvern deliver pipe to Continental's well locations was an improper interference. That's how they were instructed. So it's very likely that they just didn't like Continental Resources calling one of its suppliers and saying we don't want Janvern's trucks coming to our well locations. They were instructed, if you think that was improper, you can rule against Continental. Because you have a flawed jury instruction, we don't know what the jury, how they came to the result, because they were instructed incorrectly. But I think it's very important that in their response brief, the plaintiff argues that it was clear that the request was to prevent Janvern from delivering to any Continental locations in the Bowman area, and our argument is either way. We could have gone to CTAP and said we don't want you having Mr. Janvern deliver to any of our well locations throughout the United States. I see what you're saying. It seems this is kind of a shift from a position in the district court. Well, no. Our witnesses . . . Not your position. No, that's not a shift at all. The plaintiff's position has shifted. But I understand what you're saying. But what I'm trying to get at is why did the court let this go to the jury at all if that's really all this was about? Well, I mean, we filed a motion for summary judgment we thought would be granted. The court suggested in one of its orders that the jury might find that, in fact, what was going on here was an attempt by your client to keep CTAP from using Janvern anywhere, not just on any of its properties, but anywhere. Wasn't that what the district court said in one of its orders? The district court may have said that, but that wasn't the testimony of the witnesses. The witnesses' testimony . . . It's not the position of the plaintiff in this brief. Right. Okay. Right. I see what you're saying. The position shifted slightly in the briefs. But what this focuses us on is that the business expectancy that was allegedly interfered with was delivering pipe to continental well locations. And the plaintiff does not have the right to deliver pipe to continental well locations. Continental had the absolute right to exclude Janvern from their well locations. And that was . . . I mean, the law is clear on the absolute right part. It all starts with a Brackus v. Illinois, and that's a United States Supreme Court case in which this U.S. Supreme Court said one of the main rights attaching to property is the right to exclude others. The district court did not offer an independent explanation or definition of an improper interference. Is that right? No. Did anyone offer that in the conversation of the concern that you've raised, that you raised with the district court? Well, we offered instructions number five and six for us, which explained to the jury very clearly that someone like Continental has an absolute right to exclude people from their property. And then we had an instruction that quoted from Johnson v. Schmidt, which is the South Dakota Supreme Court, which states there is no liability for procuring a breach of contract where such breach is caused by the exercise of an absolute right, that is, by an act which a person has a definite right to do. Then that seems to get to the first step, the idea of the absolute right. I guess what I'm trying to get at, was there any discussion about how to define what improper would be? Because as I see the distinction that we've been talking about, is the difference between causing harm to the contract that Continental is a part of, or would be the recipient of, versus any other shipments or loads that he might be, that Mr. Javren might be contracting through CTAP, but with someone independent of Continental. It seems to me that that, would you agree that would be improper, if that's what Continental did? Right. So was there any discussion at the district court of trying to parse that out and actually give a definition that would have guided the jury a little bit better? Well, we felt like we had the right to exclude him from our property, so I don't believe we had the discussion you're talking about, but we hammered on and on about how we had the right to exclude him from our property, and that's what the witness has testified to, and that's even what Mr. Javren argues in his brief to the court, is that we had requested for him not to come to our well locations, and since we did that, and most of his business was apparently hauling to Continental well locations, then ipso facto, if he went out of business, it's our fault and we're liable. But the case law, it's in the briefs, but there's so much case law. The Fifth Circuit, DBI versus Amarato-Hess, it's on all fours. DBI was a trucking company. Amarato-Hess was an oil and gas operator like Continental. Amarato-Hess decided it didn't want DBI trucks coming onto its well locations and actually reached out and contacted one of its suppliers saying, don't send DBI's trucks to our well locations, and DBI sued for tortious interference. It's a case that's almost on all fours. And the motivation for that action is irrelevant. The motivation is irrelevant because you're talking about... However mean-spirited it might be. That's the difference between an absolute right and just a simple, well, you can do this, but not if you improperly interfere. What the district court did to us in the trial, she made our right to exclude people from our property conditional, conditional on whether we had a proper purpose or not. And the whole trial evolved down to, well, did Continental have a good reason for excluding Janvin from its property? And the jury obviously didn't think we had a very good reason. They got mad at us and ruled against us and assessed punitive damages. And the DBI case is not the only case out there. You've got... Interestingly, you've got a case with Miller Brewing Company. It banned a trucking company from coming onto its brewery to pick up beer, and it sued for tortious interference. And the court said, no, Miller Brewing Company is within its absolute rights. Same thing with Borden Milk Company. Borden buys milk from the dairies, and Borden, and this is a Seventh Circuit case, it banned a certain trucking company from hauling milk into the Borden facility and told the farmers, if you put your milk on their trucks, we're not taking it. And the Seventh Circuit upheld summary judgment, saying that was their absolute right to determine who comes onto their property. So I say I'm out of time, but I'll answer any questions. Not at the moment, thank you. Thanks. Mr. Barker, good morning. You may proceed. Good morning, Judge Woolman. Good morning to the panel. My name is Ken Barker. I'm from Belfouche, and my firm, Barker-Wilson Law Firm, represents Jerry Janvren. In this case, I think in addressing your question, Judge Woolman, I think the facts are important because the case that was just presented to this panel by Continental isn't the case that was tried to the jury, nor is it the case that the judge ruled on in our favor, not only on summary judgment, but also on the post-trial motions for J&OB and new trial. Rather, the case that was just presented by Continental is a case that does not exist. For the argument you heard to succeed, the facts of the case would have to change. Okay, that's okay. I will speak up. Thanks for telling me. So the facts of the case would have to change, and here's how the facts would change. Gordon Carlson, Continental's supervisor, was reading his newspaper on the afternoon of February 19th of 2014. In that newspaper, there was an article about a collision between a driver on a busy county road and livestock that killed the livestock. There is a statement attributed to Jerry Janvren that says, Many drivers on the road are going too fast for the condition of the rural road. Mr. Carlson, as the supervisor of Continental, is offended by that comment. Drivers on the road are going too fast for road conditions. And so he knows Jerry Janvren, who is his neighbor down the road. He knows Mr. Janvren is a ranch hand, and he started a side business of trucking. The side business was started in 2010. It started with one truck and grew. He calls Mr. Janvren up on the phone, and he says, Jerry, listen, I'm offended by your comment. Or he could say, I'm not offended. He could say nothing. He could just say, Mr. Janvren, you are no longer allowed to truck any materials to any site in which Continental is doing business, period. Mr. Carlson and Continental could reinforce that right by calling CT, CTAP, and saying, we just told Mr. Janvren that he is not to deliver materials to our site. Now, if you have other work for him, that's fine. Or they could just say, stop the conversation there. Janvren is no longer allowed to truck materials to Continental. That's the case that Continental wishes to present to this court, but that's not the case that happened. The facts that are presented to the jury start when Jerry Janvren got a visit from a local young man who had a young family. He said, I'd like to start a business. I'd like to work a little more than I have been to support my family. I'd like to have a second job. And Jerry Janvren, you have a truck sitting here that's not working. The oil field, the Bakken, is busier than heck. And I think I can jump in your truck, make you some money, and we can get the business started. And there's where it started. And Jerry Janvren's trucking business, J&J, grew from one truck to six trucks. And he had a unique situation where he hired local ranchers who had spare time between their seasons to jump in the truck and go on day trips. Worked out very well for not only CTAP, who just used him as a backup, but also worked out well for the local ranchers who earned additional income. So the rest of the facts are, as they were presented, were this, and very important. So we go to the afternoon that the newspaper was delivered, and the Harding County newspaper mentions the article. And Gordon Carlson reads the article and is offended and calls Peter McIntyre down at headquarters in Oklahoma and said, I'm offended. Peter McIntyre testified that he waited several days, maybe as much as a week, and he went to Mr. Anderson, a supervisor, and said, we've got a problem down in the Buffalo field. Apparently there was a statement attributed to Jerry Janvren. We need to do something about it. And so Mr. Anderson then calls Stoney McCarroll from CTAP. He testified that that call took, it was about a week later or so, give or take a few days, they weren't sure. But they transmitted by e-mail this article. Surprisingly, in the discovery process, none of those e-mails exist. But the testimony is that Mr. McCarroll was called, and he was told by Mr. Anderson in his disputed testimony, and to address a question raised by the court, and cited by the trial court in its opinion, that McCarroll's testimony at least twice was, I thought the direction was to terminate Jerry Janvren for all of CTAP's business. And to the comment that, a wink and a nod, it was a comment that was made at trial. I think in political circles it's called plausible deniability. But nevertheless, the effect is the same. So despite the fact that Continental's witnesses testified. I'm sorry. So you used that term in your closing argument to the jury. I did. As I recall. What's the wink and a nod? You just said it was expressed. But I thought the testimony was that the phone call only had to do with stopping deliveries to Continental's wellheads or whatever. Specifically. You just said it was stop using Janvren for anything. That's not what you said in your brief, is it? It is what we said in our brief, Your Honor. It's what we said at the trial court level as well, is that the effect was McCarroll's interpretation, and we cited it in our brief, was McCarroll's interpretation of that was that quit using him for any business out of the Bowman Yards. And the record reflects that 95% of what Jerry Janvren did through his trucking business, 95% of it was through the Bowman Yards. And so that's effectively terminating him from the business. Now, Continental wanted to argue, well, we just meant please don't send him down to the Buffalo District. The Buffalo District comprised a very, very small fraction of what J&J Trucking did. I thought it was a don't send him to any of our places. Your Honor. That's different from don't send him anywhere, don't give him any business. That's the whole nub of the case here. It is the nub of the case in terms of how did McCarroll. The conversation, it seems to me, is just at most don't send him to any of our places. The conversation, McCarroll's testimony was, and that's important, McCarroll's testimony was to quit it. I'll take a quick word. I'll take a very careful word. And I appreciate the fact that you will. But it also has to be put in context, Judge Arnold. And the context was that this whole process of these communications to take place through Continental and to go back to CTAP and then for the message to be delivered, according to their testimony, took weeks or days, at least a week or more. My timeline that I did in presence of the jury was more than that. Jerry Jambrin's testimony, and there was another witness that testified, that he received the call from CTAP on the night that the newspaper was delivered. So the context of the reason why that's important is why did Continental lie? There was testimony and evidence to suggest that they manufactured this whole story about how they were going to go through the process. And so the jury was allowed to consider and weigh the credibility of the witnesses. And the credibility of the Continental witnesses, frankly, just didn't match up. And that's very important. There's also testimony that Gordon Carlson was heard bragging that he put a local trucking business out of business. And that's important testimony. And there was also testimony that the reason why Continental did this, and this is something that came up at trial, was because Jerry Jambrin showed up at well sites without appropriate safety gear. Without what? Appropriate safety gear, hard hat and boots and gloves. And that was another point of contention at trial. Continental's a very sophisticated company. When there's a safety violation, that's a big deal. There wasn't any record of when he did that, what well sites that had to have occurred. There were no witnesses to support that. It was merely hearsay that that's what was reported. There were no records and there were no complaints to CTAP, not one complaint. To the contrary, CTAP said that he had exemplary service. That he was somebody that they could always rely upon, especially when they're particularly short of trucks. It said Jerry Jambrin was a person that they could call up and that they would rely upon when it got tight. So the distinction between the authorities cited by Continental in its brief and how they fit to this case, the DBI case is very important. It's a case that's really illustrative of why there is a distinction between Continental's case and Jerry Jambrin's case. And that is, in the DBI case, Merida Hess went directly to DBI and said, just as I did in the scenario I painted at the beginning of my visit with you, is that you're no longer going to do business with us. And then DBI went behind its back and through three different subcontractors tried to circumvent what they had just been told by Merida Hess. And that is, they went behind its back and tried to use DBI as subcontractors. And DBI said, no, so go. Not going to do it. We told you that we had a legitimate reason why we didn't want to do business with you. How did the parties argue the improper interference in closing or to the jury through the course of the case? I'm glad that you mentioned it because I wrote a note about it when you asked it in the question of counsel. And there are seven factors that indicate whether a party acted improperly. And those factors were cited by the trial judge as well in its decision. And it's in the Gruholke case, G-R-U-H-L-K-E. And the seven factors essentially, and I'll condense them for purposes of time, but essentially the actor's conduct, what was the actor's motive, what were the interests, and what are the social interests that are involved, that are necessary for protection, and the proximity or remoteness of the actor's conduct to the interference. Now, again, I'm paraphrasing and summarizing for brevity, but essentially how that fits into our case is that Jerry Janvern made a comment about safety in the press. And there had been some animosity between Continental and some of Mr. Janvern's relatives. It didn't involve Mr. Janvern, but there was retribution. And the retribution was to do what I had previously described. That's the improper motive. Carrying out that improper motive was the certainty or substantial certainty that the communication to CTAP was going to be interpreted in such a way where CTAP, who Continental is their major customer, is their primary customer in the Bakken, is going to take action. Had the scenario been painted where they called Jerry Janvern up and said, you're not going to do business, you're not going to haul to us, we wouldn't be here. That's not the scenario that happened. Those aren't the facts. But that's the improper purpose. They went behind his back and went directly to CTAP to influence CTAP's work with Mr. Janvern. And back to Judge Arnold's comment about the wink and the nod or the plausible deniability, there was certainty or substantial certainty that that communication from one of the administrators of Continental, who is very high up, one of the officers, one of the principals, I should say, not an officer, principals of Continental, made a call to a vice president of CTAP and asked the question, do you have a J&J hauling for you? Yes. Well, and then the conversation becomes a little vague. But the conversation ultimately ended up with Jerry Janvern getting a call that night from Ron Spiedel, CTAP's manager, terminal manager, saying, you're no longer going to do business for us. I thought you said the conversation was explicit. Not vague, but explicit. They said, we don't want you using Janvern anywhere. Well, unfortunately, we think it's we weren't there, of course. But we think it's we have his testimony twice in the transcript where he said, my interpretation was Mr. Janvern's done. And the facts are that he got the call that night and he was done. And so that's our case, and we ask this court to affirm the trial court on its denial of the motions for J&OV and new trial. I see I'm out of time. Thank you. Have I addressed all the questions? Thank you. Let's see. Do we have questions? I believe Mr. Chilton used all his time. Do we have questions for him? I think I used up all my time. Do I have any more time? Do you have any questions? Well, very well. We'll rest on the arguments that you presented. The case is now submitted, and we will take it under consideration. Madam Clerk, I believe that completes our arguments for the